## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

SHARON GLYNN,

Plaintiff,

v.

VILLAGE PRACTICE
MANAGEMENT COMPANY, LLC,

Defendant.

Case No. 22-cv-1612

Judge Mary M. Rowland

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Sharon Glynn ("Glynn") sued her former employer, Village Practice Management Company, LLC ("Village Practice"), alleging that it discriminated against and failed to accommodate her in violation of the Americans with Disabilities Act ("ADA"), and interfered and retaliated against her in violation of the Family Medical Leave Act ("FMLA") [18]. Defendant Village Practice moves now for summary judgment. [50]. Village Practice further moves for sanctions [63]; [66]; and Glynn moves for leave to file corrected exhibits of job descriptions [93]. For the reasons explained below, this Court grants in part and denies in part Village Practice's motion for summary judgment [50]; denies Village Practice's motion for sanctions [63]; [66][1]; and grants Glynn's motion for leave [93][2].

---

[1] The Court denies Village Practice's motion for sanctions, [63]; [66]. This case is highly fact intensive with vigorously disputed facts. It is well established that to prevail on a motion for sanctions, the movant must satisfy a high burden, and sanctions must be imposed with the "utmost care and caution." *Federal Deposit Ins. Corp. v. Tekfen Cons. and Installation Co.*, 847 F.2d 440, 445 (7th Cir. 1988). Here, Glynn's suit cannot be characterized as groundless. Indeed, when viewing the light most favorable to Glynn, a reasonable jury could determine that she meets her burden on at least some of her claims. The motion for sanctions is denied.

[2] After briefing was completed, Glynn moved to substitute Exhibits 2 and 3 with Corrected Exhibits 2A and 3A [93]; [93-1]. This substitution has no impact on the Court's ruling. The motion is granted over objection.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id*. After a "properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id*. at 250 (quoting Fed. R. Civ. P. 56(e)).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

## BACKGROUND

The Court takes the following background facts from Village Practice's statement of facts [52]; [56], Glynn's response to Village Practice's statements of facts [68], Glynn's statement of additional facts [69], and Village Practice's response to Glynn's statement of additional facts [81]; [82]. The Court notes where material facts are disputed.

### *Village Practice employs Sharon Glynn.*

Plaintiff Sharon Glynn was employed by Defendant Village Practice as its Director of Healthcare Analytics for the New Hampshire market between August 21, 2017, and June 11, 2019. [56] ¶ 2. As the Director of Healthcare Analytics for the New Hampshire market, Glynn worked with Village Practice's partners and clients, and was responsible for working with electronic medical records and data. *Id*. ¶ 4. Glynn was previously diagnosed with and suffered from major depression, generalized anxiety disorder, and Sjrogen's Syndrome. *Id*. ¶ 5. While Glynn had not been diagnosed with Sjrogen's Syndrome until 2010, she had informal accommodations in place since 2000 related to her condition with previous employers. *Id*. ¶ 7.

In August 2017, prior to Glynn accepting her offer of employment, she discussed her medical conditions that could interfere with her daily life with Lisa Sherwin ("Sherwin")—the then Vice President and General Manager for the New Hampshire market—and requested accommodations. *Id*. ¶ 9. Sherwin agreed Glynn could have flexible hours and work from home between two to three days a week, and Glynn subsequently accepted the employment offer. *Id*. ¶ 10. From August 2017 to

3

May 21, 2018, Glynn was the only analyst that worked in Village Practice's New Hampshire market and was based out of their New Hampshire office. *Id*. ¶ 11. Mark Skvara also worked in the New Hampshire market but was based out of the Virginia office. [68] ¶ 11.

In April 2018, Sherwin changed roles within the company and Glynn began reporting to Jane May ("May"), the new Vice President and General Manager in the New Hampshire market. [56] ¶ 12. Shortly after, Glynn discussed the accommodations that had been previously approved by Sherwin with May, and May agreed to and supported the continuing accommodations. *Id*. ¶ 13.

### *Village Practice searches for a second analyst.*

In April 2018, Village Practice recognized the need to (and began searching for) a second analyst in the New Hampshire market to support Glynn. *Id*. ¶ 14. Village Practice claims it decided to hire a second analyst in order to: (i) increase the company's volume and maturity in the market, (ii) install a new data platform that required different skillsets, and (iii) the Population Health Operations Department also needed support. *Id*. ¶ 15. Glynn disputes this, claiming the second analyst replaced Skvara. [68] ¶ 15.

On May 21, 2018, Village Practice hired Jamie Fralick ("Fralick") as its Senior Analyst, Healthcare Informatics for the New Hampshire market. [56] ¶ 16. Fralick reported to Glynn, who was responsible for Fralick's supervision and training. [69] ¶¶ 4-5. Fralick served in this role until she resigned on August 14, 2018. [56] ¶ 17. Shortly after Fralick's resignation, Glynn began requesting that Village Practice hire

4

a second analyst in the market so she could have more time for value added work. *Id*. ¶ 19. Despite these requests, Village Practice did not immediately hire anyone to assume Fralick's responsibilities. *Id*. ¶ 18. Although it did not immediately begin searching for a second analyst, Village Practice initially planned to hire an employee more junior than Glynn to replace Fralick. [69] ¶ 6. On November 2, 2018, Village Practice approved the hiring of a second analyst. [56] ¶ 20.

### *Glynn inquires about and requests FMLA leave.*

In June 2018, Glynn reached out to Village Practice's Human Resources representative Alisha Pharr ("Pharr") and inquired about using intermittent Family Medical Leave ("FMLA leave"). [69] ¶ 7. Pharr responded that Glynn was ineligible because she hadn't yet worked for Village Practice for a year. *Id*.

Pharr told Glynn in August 2018 that she had become eligible. *Id*. In December 2018, Meredith Williams ("Williams"), Director of Talent Operations, emailed Pharr asking her about the dates of her communications with Glynn regarding FMLA. *Id*. ¶ 8.

On January 15, 2019, Glynn again spoke with Pharr about FMLA and possible accommodations. *Id*. ¶ 9. Pharr sent Glynn an application form for FMLA leave that Glynn completed and returned. *Id*. ¶ 10. On February 7, 2019, Glynn met with May and Jen Clair ("Clair"), Chief Analytics Officer, to discuss goals, setting a new stage for 2019 and expectations. *Id*. ¶ 11. May's notes included that Williams mentioned not to bring up Glynn's health, and if health was mentioned to pivot the question to Williams. *Id*.

On February 14, 2019, Tom Buchanan, New Hampshire market President, emailed Clair and May stating that the company "need[ed] to move quickly on [the] analytics position. We are not going to get much out of Sharon [Glynn]. The FMLA musical chairs have started." *Id*. ¶ 12. May, who supervised Glynn, reported directly to Buchanan. *Id*. Clair sent Buchanan a response email that included a proposed job description for a Manager or Senior Manager position for New Hampshire. *Id*. ¶ 13.

### Glynn's initial FMLA leave.

On February 25, 2019, Glynn commenced her initial FMLA leave that was approved by Village Practice up until April 7, 2019. [56] ¶ 25.[3] Her leave was then extended to May 8, 2019, and extended again to May 13, 2019. *Id*. ¶¶ 26-27. It is undisputed that between February 25, 2019, and May 12, 2019, no person at Village Practice (i) objected to Glynn taking leave, (ii) informed Glynn she could or should not take leave, (iii) informed Glynn she could not return to work during this time or (iv) sent Glynn assignments or projects that she needed to start or finish during her leave. *Id*. ¶ 30. During her leave, Glynn only communicated with Williams. *Id*. ¶ 31.

While Glynn was on FMLA leave, Village Practice posted a Senior Manager level second analyst position. [69] ¶ 14. During that time, Village Practice also discussed the possibility of demoting Glynn to the Senior Manager position to create less potential friction with the intended hire. *Id*. ¶ 16. On April 18, 2019, Village Practice began interviewing Pia Das ("Das") for the second analyst position. [56] ¶ 21.

---

[3] Prior to Glynn's FMLA leave request, she was scheduled to have a performance review with May in late February 2019. The parties dispute whether May intended to discuss several performance deficiencies with her at that meeting. [68] ¶ 24. It is undisputed that while Glynn was on leave, several employees had to assist with her duties. *Id*. ¶ 29.

Das commenced her employment on May 28, 2019, and was hired as a Senior Manager, Healthcare Analytics for the New Hampshire market. *Id*. ¶ 22. Village Practice maintains that it expected Das and Glynn to work together collaboratively. *Id*. ¶ 21. Glynn disputes this and maintains that the company pushed for the hire of a new analyst at her level as soon as she applied for FMLA leave. [68] ¶ 21. It is uncontested that, unlike Fralick, Village Practice made the decision that Das would not report to Glynn. [69] ¶ 15.

### *Glynn returns to work after her initial FMLA leave.*

On May 9, 2019, Glynn's primary care physician, Dr. Sarah Murphy ("Dr. Murphy") approved Glynn's return to work as of May 13, 2019, with an accommodation of working from home 2 times a week to help with her fatigue related to Sjogren's syndrome. [56] ¶ 28. On May 13, 2019, Glynn returned to work (with her flexible work schedule intact) in the same Director of Healthcare Analytics for the New Hampshire market role, and she worked in this position until May 29, 2019, when she requested a continuation of her FMLA leave. *Id*. ¶ 32. When she returned to work, she retained her hours, pay, benefits, and reported to May. *Id*. ¶ 34.

Glynn admits that she retained her title, hours, pay, benefits, and still reported to May, but disputes that she had the same responsibilities upon her return. [68] ¶ 34. Glynn asserts that that May told her she was not going to be involved in Das's supervision or training. *Id* ¶ 32. Glynn claims that May told her all her duties had been assigned to Das, and she no longer had supervisory responsibilities over the second analyst. *Id*. Village Practice admits that it gave Glynn minimal work to do

upon her return, mostly consisting of catching up on eleven weeks of emails and getting a status of any outstanding projects. [56] ¶ 37; [82] ¶ 18. Village Practice explains that May wanted to give Glynn a few weeks to get acclimated upon her return before giving her additional work assignments. [82] ¶ 18. Glynn complained to Williams that May was hostile and cold towards her upon her return from FMLA leave, as she had previously been cordial. [69] ¶ 21.

Despite May's stated intent to allow Glynn time to acclimate, Glynn requested additional work from her. May responded that she did not have any work for Glynn. [69] ¶ 19. May further told Glynn that her role had not been determined. *Id*. Village Practice disputes this, and explains that while Glynn was on leave, the company launched docOS, a new proprietary platform, for which Glynn and Das's roles had not yet been defined. [82] ¶ 19. Village Practice further disputes that May ever told Glynn (1) all her duties had been assigned to Das, (2) that May didn't have any work for Glynn, and (3) no decision had been made on how workload and assignments would be distributed. *Id*.

### *Glynn goes on a second FMLA leave.*

On May 29, 2019, Glynn met with Dr. Murphy regarding the depression she was experiencing since returning to her job. [69] ¶ 24. Dr. Murphy prescribed her additional medication and diagnosed her as experiencing major depression in addition to her pre-existing anxiety condition. *Id*. Glynn was familiar with one of the medications as she had used it before. *Id*. Dr. Murphy told Glynn that it would take

8

2-3 weeks to adjust to the new medication, which was consistent with Glynn's experience with prior medication adjustments. *Id.* ¶ 26.

On May 29, 2019, Glynn, in consultation with Dr. Murphy, opened a new claim with Village Practice's short-term disability company, Dearborn National, to take additional FMLA leave. [56] ¶ 39. On the same day, Glynn emailed Williams and Pharr, informing them (1) she had consulted with Dr. Murphy, who recommended that she go on disability leave, and (2) she had already spoken with Dearborn National and started a short-term disability claim effective May 30, 2019. *Id.* ¶ 41. Glynn's leave began May 29, 2019. *Id.* ¶ 42.

Village Practice admits that the sole purpose of Glynn's second requested medical leave was to provide time for the newly prescribed medicine to become effective. [82] ¶ 29. Village Practice also acknowledges that once Glynn's medications were successfully adjusted, she would be ready to return to work. *Id.* ¶ 30.

Village Practice maintains that on May 31, 2019, Glynn informed Williams that Dr. Murphy had told Glynn she would need to be on additional leave through *at least October 2019.* [56] ¶¶ 45-46.[4] Williams testified at her deposition that she was not sure if Village Practice could accommodate four and a half additional months of FMLA leave and would follow up. *Id.* Glynn counters that she told Williams she would

---

[4] Village Practice did not request that Glynn provide a note from any health care provider to support her request for additional leave. [82] ¶ 33. On June 3, 2019, Dr. Murphy submitted a claim form to Dearborn National for Glynn's short-term disability. *Id.* ¶ 36; [56] ¶ 47. It is undisputed that this form was not received, reviewed, or relied upon by Village Practice in deciding to terminate Glynn's employment. [69] ¶ 36. The claim form stated that "[Glynn] was unable to return to work from May 30, 2019, to October 23, 2019: the next follow up visit." [56] ¶ 47. In response to the question of "How long do you expect these restrictions and limitations to impair your patient," the claim form provided "unable to determine, follow up in 5 months appt[.] on 10/23/2019". *Id.*

only need an additional *2-3 weeks of leave* to get her medications adjusted, which was based on her prior experiences with medication management. [68] ¶¶ 45-46; [69] ¶¶ 23-26, 29-30; 37-38.

### *Village Practice terminates Glynn.*

In approximately late May 2019 to early June 2019, Village Practice maintains Williams consulted with May to determine if the company could accommodate the alleged 4.5 additional months of FMLA leave. [56] ¶ 55. Glynn disputes this ever occurred, noting that May testified at her deposition that her understanding from Williams was that there was no specific time frame, and Glynn further disputes she ever told Williams she needed 4.5 months and only requested 2-3 weeks. [68] ¶ 55. Village Practice claims during the alleged meeting, Williams and May determined that the company could not accommodate the additional 4.5 months. [56] ¶ 56. Instead, the company made the business decision to terminate Glynn's employment. *Id.* ¶57.

On June 10, 2019, Williams emailed May an internal talking points memorandum ("memo") in connection with their anticipated termination call with Glynn later that day. *Id.* ¶ 58. The memo provided that the company couldn't support 16 additional weeks of leave. *Id.* ¶ 59. The memo also included that the firing was "entirely based on [Glynn's] performance". [69] ¶ 41. That same day, Williams and May called Glynn and told her she was being terminated effective June 11, 2019, and thereafter sent her a termination letter. [56] ¶ 60. However, during the call, Williams told Glynn that she was being terminated because Village Practice could not

accommodate additional time off. [69] ¶ 42. Williams did not mention an October return date nor performance issues. *Id*. May testified at her deposition that Glynn was not fired for performance reasons. *Id*. ¶ 43.

Between May 30, 2019, and June 10, 2019, it is undisputed that no person at Village Practice objected to Glynn taking leave, or informed Glynn that she should not or could not take leave. [56] ¶ 61. It is, however, disputed whether Village Practice had discussions to replace Glynn while out on her second leave. [68] ¶¶ 62-63.

### *Village Practice hires a second analyst.*

Village Practice maintains that it had a need beginning in April 2018 for two analysts in the New Hampshire market. [56] ¶ 64. Glynn disputes the truth of that assertion, noting that Village Practice had only one analyst in the New Hampshire market from June 11, 2019, to October 29, 2019 (Das). [68] ¶ 64. At that time, Village Practice hired John Scerpella ("Scerpella") as a Senior Analyst, Healthcare Analytics for the New Hampshire market. [56] ¶ 65. Scerpella and Das were the two analysts in the New Hampshire market as of October 29, 2019. *Id*. Das performed the bulk of Glynn's duties after she was terminated. [69] ¶ 45.

### *Glynn follows up with Dr. Murphy following her termination.*

On June 17, 2019, Glynn sent Dr. Murphy a message on the patient MyChart[5] portal, stating in relevant part that this was not a good week for evaluation of the medication, as she was terminated from her job. [56-14] at 2. She further stated, "as

---

[5] MyChart is an online portal that provides patients access to their health information and a direct connection to their care team through direct messages. *See* About MyChart, MYCHART BY EPIC, https://www.mychart.org/About/ (last visited April 30, 2024).

11

for [her] job, [she] may have misunderstood [Dr. Murphy] when [she] said to stay out of work", noting she took it as a direction to go on short term disability again. Of note, Glynn also stated when "the nurse filled out the paperwork [,] she wrote October as my return date since that is when my next appointment is scheduled." *Id*. Glynn wrote that she "verbally told [her] company that it wouldn't be that long [,] but they decided that they couldn't accommodate [her] request for more time off (FMLA had run out". *Id*. Glynn closed the message by thanking Dr. Murphy and stating her hope that she could give Dr. Murphy a better evaluation of the medication the following week. *Id*. Dr. Murphy responded that same day, stating that she was apologetic that the "work situation didn't work out", but noted that Glynn's trial return had gone so poorly, she didn't believe Glynn would have been successful in that environment and she thought Glynn believed she wouldn't be able to return in the "near future". *Id*. Dr. Murphy then requested Glynn to update her the following week and sent her well wishes. *Id*. Glynn responded shortly after, thanking Dr. Murphy for her support and stating she would update Dr. Murphy as requested. *Id*.

Glynn was able to return to work by June 24, 2019. [69] ¶ 39. On June 30, 2019, Glynn communicated to Dr. Murphy through MyChart that the new medication prescribed was "working well". [82-2] at 2. On July 5, 2019, Glynn sent a message to Dr. Murphy, informing her that the New Hampshire Employment Security Office had asked her to get a letter from her physician stating she was able to work without restrictions as of June 24, 2019, so Glynn could receive unemployment benefits. [56] ¶ 73. On July 7, 2019, Dr. Murphy wrote a letter to the New Hampshire Employment

Security Office, providing that "As of June 24, 2019, Patient [Glynn] was medically cleared to return to work without any restrictions." *Id*. ¶ 74.

Plaintiff brings her amended complaint under 42 U.S.C. § 12112, the Americans with Disabilities Act, alleging that Village Practice failed to reasonably accommodate her and discriminated against her, and under 29 U.S.C. § 2615, the Family Medical Leave Act, alleging that Village Practice interfered with her rights and retaliated against her. [18]. Village Practice denies liability and moves for summary judgment. [50].

## ANALYSIS

Village Practice moves for summary judgment, arguing that: (1) Counts I (failure to accommodate under the ADA) and II (disability discrimination under the ADA) fail as a matter of law because Glynn cannot establish she was a "qualified individual", (2) Count III (FMLA interference) fails because Glynn cannot prove anyone interfered with her leave, and (3) Count IV (FMLA retaliation) fails because Glynn cannot demonstrate she could return to work or establish a causal connection between her termination and her leave. [55] at 11-20. The Court analyzes each set of claims in turn below.

### I.    ADA claims

Village Practice first argues that Glynn requested 4.5 months of additional FMLA leave, removing her from "qualified individual" status under the ADA. *Id*. at 11-13. Glynn counters that she only requested 2-3 weeks of leave, which is a reasonable accommodation under Seventh Circuit caselaw. [67] at 7-13. Glynn also

13

argues that there are numerous material factual disputes, which must be resolved in her favor at this stage. *Id.* at 1, 7-8, 15. The Court agrees with Glynn.

### A. Glynn's status as a "qualified individual" under the ADA is a triable issue.

To prevail on a claim for discrimination under the ADA, a plaintiff must establish that (1) she was disabled within the meaning of the ADA; (2) she was qualified to perform the essential functions of her job, with or without reasonable accommodation; and (3) she suffered an adverse employment action because of her disability. *Sandefur v. Dart*, 979 F.3d 1145, 1151 (7th Cir. 2020). A plaintiff "bears the burden of establishing that [s]he is a 'qualified individual' with a disability at the time of her termination." *Taylor-Novotny v. Health All. Med. Plans*, Inc., 772 F.3d 478, 493 (7th Cir. 2014) (citing *Majors v. GE*, 714 F.3d 527, 534-35 (7th Cir. 2013)). After an employee has disclosed that she has a disability, the ADA requires an employer to "engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances." *E.E.O.C. v. Sears, Roebuck & Co.,* 417 F.3d 789, 805 (7th Cir. 2005) (quoting *Gile v. United Airlines, Inc.,* 213 F.3d 365, 373 (7th Cir.2000)).

To survive summary judgment on a failure to accommodate claim, Glynn must show that (1) she is a qualified individual with a disability; (2) her employer was aware of this disability; and (3) her employer failed to reasonably accommodate her

14

disability. *Guzman v. Brown County.,* 884 F.3d 633, 642 (7th Cir. 2018) (internal quotation marks omitted) (citing *E.E.O.C.*, 417 F.3d at 797).

Here, Glynn has provided sufficient factual evidence that she was a qualified individual when she was terminated to defeat summary judgment on both the disability discrimination and failure to accommodate claim. At top, the summary judgment standard requires the Court to consider all the evidence in the record in the light most favorable to Glynn and draw all reasonable inferences from that evidence in her favor. *Logan,* 4 F.4th at 536. The Court must also "refrain from making credibility determinations or weighing evidence." *Viamedia, Inc.,* 951 F.3d at 467. The Court therefore cannot resolve credibility disputes or differing versions of events in favor of the moving party on summary judgment. Indeed, the Court cannot disregard Glynn's deposition testimony that she told Williams she only requested 2-3 weeks for her second FMLA leave to manage her medication. She has also presented evidence to support that fact, including: Dr. Murphy's testimony that she told Glynn it would take several weeks for her medication to adjust, that Glynn knew from experience that it would take 2-3 weeks for her medication to adjust, that Village Practice admits Glynn only requested leave a second time to allow time for her medication to become effective, and that Glynn contemporaneously told Dr. Murphy via the MyChart portal that she relayed to her company she only needed a few weeks off prior to being terminated. Further, according to her medical record, she was

cleared to return to work on June 24, 2019, approximately on the timeline she alleges she requested.

Accordingly, all the cases cited by Village Practice are unpersuasive. It is undisputed that "an employee who needs long-term medical leave cannot work and thus is not a qualified individual under the ADA." *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 478-79 (7th Cir. 2017) (citing *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003)) (internal quotation marks omitted). But here, it is a disputed fact whether Glynn requested leave totaling 4.5 months. A jury will need to decide that issue.

Village Practice also admits it did not engage in the interactive process but argues that it is immaterial since Glynn was not a qualified individual. [55] at 13. The Court disagrees. The interactive process, including following up with Glynn or discussing the request with one of Glynn's medical treaters, would have clarified how much time Glynn was seeking and what accommodation was requested. Short-term leave can be a reasonable accommodation request. *See Haschmann v. Time Warner Entertainment Co.*, 151 F.3d 591, 601, (7th Cir. 1998) (finding that a request of 2-4 weeks could have been a reasonable accommodation); *see also Severson*, 872 F.3d at 481 (noting a brief period of leave could be a reasonable accommodation). In sum,

16

whether Glynn requested 2-3 weeks of FMLA leave, according to her testimony, or 4.5 months, according to Williams' testimony, is a question of fact for the jury.

Accordingly, Count I and Count II survive summary judgment.

## II. FMLA claims

### A. Glynn cannot establish that Village Practice interfered with her FMLA leave.

Village Practice argues that the record establishes it never interfered with Glynn's ability to request or take FMLA leave and Count III therefore fails as a matter of law. [55] at 14-17. The Court agrees.

To prevail on a claim of FMLA interference, Glynn must establish that "(1) she was eligible for the FMLA's protections, (2) her employer was covered by the FMLA, (3) she was entitled to leave under the FMLA, (4) she provided sufficient notice of her intent to take leave, and (5) her employer denied her FMLA benefits to which she was entitled." *Guzman*, 884 F.3d at 638.

Here, it is undisputed that when Glynn returned to work (with her flexible work schedule intact), she had the same title, hours, pay, benefits, and still reported to May. On this issue, *Taylor-Novotny* is instructive. 772 F.3d at 478. There, the plaintiff filed suit under the ADA and FMLA. *Id.* at 481-482. There, like here, the plaintiff alleged her employer interfered with her FMLA rights. *Id.* at 482. The Seventh Circuit disagreed. The Seventh Circuit reasoned that the plaintiff's claim failed because her employer never denied her leave. *Id.* It further reasoned that the plaintiff had to show that she made a request under the FMLA, and her employer *denied* that request, which the plaintiff could not establish. *Id.* at 498. So too here.

Glynn cannot establish that she requested leave and was subsequently denied that leave by Village Practice. In fact, Glynn took FMLA leave until it ran out. Her claim therefore fails.

Glynn argues that the hiring of Das interfered with her ability to take FMLA leave since she was not given the same job duties when she returned. [67] at 3-6. But the statute solely requires that Glynn was restored to the same position or an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment. 29 U.S.C. § 2614(a)(1)(A)-(B). Glynn concedes that when she returned, (1) she was reinstated to the same title, position, and pay, and (2) no one at Village Practice told her she could not or should not take leave. To succeed on an interference claim, Glynn must satisfy five elements, described *supra*. Here, it is undisputed that she cannot establish the *fifth prong* of the test: that she was in fact denied FMLA benefits despite her requests. The evidence establishes the contrary— Glynn requested FMLA, and she was granted it.

Accordingly, Village Practice's motion for summary judgment is granted as to Count III.

### B. Glynn raises a triable issue on FMLA retaliation.

Village Practice argues that Glynn's retaliation claim fails as a matter of law because (1) the undisputed facts demonstrate that Glynn did not return after exhausting her FMLA leave, (2) under the direct proof method there is no causal connection between Glynn's termination and her leave, and (3) under the indirect proof method there is no evidence of any other similarly situated employees, and

Village Practice believed she could not return to work until October 2019. [55] at 18-20. Glynn responds that there is direct and circumstantial evidence of Village Practice's retaliation against her for utilizing FMLA leave. [67] at 2-7. The Court agrees with Glynn.

To prove an FMLA retaliation claim, the plaintiff must prove she (1) engaged in a statutorily protected activity, (2) suffered an adverse employment action, and (3) there is a causal link between the two. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (citing *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015)). The causal connection prong asks "whether the evidence could support a causal connection between those instances of protected activity and those adverse actions." *King v. Ford Motor Co.*, 872 F.3d 833, 841–42 (7th Cir. 2017) (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764–66 (7th Cir. 2016)). In deciding that question, courts are to "consider the evidence as a whole and ask whether a reasonable jury could draw an inference of retaliation." *King,* 872 F.3d at 841–42. Courts must not separate direct from indirect evidence and proceed as if they are subject to different legal standards. *Ortiz*, 834 F.3d at 765. Under *Ortiz*, the ultimate question is whether a reasonable juror could find that "the plaintiff would not have suffered the adverse action if she . . .  had not taken FMLA leave and everything else had remained the same." *Vanhoosier v. Franciscan All., Inc.*, 2022 WL 80484, at \*11

(N.D. Ind. Jan. 7, 2022) (citing *McCann v. Badger Mining Corp.*, 965 F.3d 578, 589 (7th Cir. 2020)).

Here, it is undisputed that Glynn satisfies the first prong because she took FMLA leave and the second because she was terminated. The dispute therefore centers on the third prong: the causal connection between the two. Glynn has provided ample evidence that the FMLA leave and the termination are causally connected. First, Village Practice had concerns about Glynn inquiring about FMLA benefits: in December 2018, before Glynn requested leave, Williams requested Pharr to specify all communications she had with Glynn about FMLA. Second, after Glynn applied for FMLA leave, the President of the New Hampshire market, Buchanan, stated that the company "needed to move quickly" to hire a second analyst, noted the company would "not … get much out of Sharon [Glynn]", and stated that the "FMLA musical chairs have started". These statements are evidence of animosity towards Glynn taking FMLA leave. *See Breneisen v. Motorola, Inc.*, 512 F.3d 972, 979 (7th Cir. 2008) (finding that purported emails, if found to be authentic, would be evidence of the defendant's discriminatory and retaliatory animus). Third, when Glynn returned to work, she testified that May told her that her duties had been taken from her and she was no longer supervising or training the second analyst, like she had done with Fralick (who Village Practice maintains Das replaced). Further, during a second period of leave she was terminated. This proximity in time could support an inference of retaliation. *See Lord*, 839 F.3d at 564 ("Suspicious timing by itself will rarely support an inference of retaliation, but it may do so when an adverse

employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct.") (internal citations omitted).

Defendant's argument that Glynn could not return to work after her FMLA leave expired, and therefore it could not have retaliated against her, is unpersuasive, as that is a question of fact for the jury. For reasons discussed *supra*, if Glynn only requested 2-3 weeks of leave, a jury could find it was a reasonable accommodation and she thus could have returned once her medications were adjusted.

Accordingly, Count IV survives summary judgment.

## CONCLUSION

For the reasons explained above, the Court grants in part and denies in part Village Practice's motion for summary judgment [50]: the Court denies summary judgment on Count I (failure to accommodate under the ADA), Count II (disability discrimination under the ADA) and Count IV (FMLA retaliation), the Court grants summary judgment on Count III (FMLA interference); the Court denies Village Practice's motion for sanctions [63]; [66]; and grants Glynn's motion for leave [93].

In person status hearing set for 5/22/24 at 9:30 am in Courtroom 1225. Parties should be prepared to set a trial date and should confer prior to that date about whether a settlement conference would be productive.

21

E N T E R:

Dated: April 30, 2024

_____
MARY M. ROWLAND
United States District Judge